**REDACTED OPINION**

# In the United States Court of Federal Claims

### No. 17-559C
### Filed: June 14, 2017
### Redacted Version Issued for Publication: July 12, 2017[1]

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * | * |
| **NOVAK BIRCH, INC.,** | * |
| | * |
| | * |
| | * |
| **Protestor,** | * |
| | * |
| **v.** | * |
| | * **Preliminary Injunction; Permanent** |
| **UNITED STATES,** | * **Injunction; Corrective Action;** |
| | * **Judgment on the Administrative** |
| **Defendant,** | * **Record.** |
| | * |
| **v.** | * |
| | * |
| **RAINMAKERS STRATEGIC** | * |
| **SOLUTIONS, LLC,** | * |
| | * |
| **Defendant-Intervenor.** | * |
| * * * * * * * * * * * * * * * * * | * |

**Jerry A. Miles**, Deale Services, LLC, Rockville, Md., for protestor.

**Devin A. Wolak**, Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **L. Misha Preheim**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Chad A. Readler**, Acting Assistant Attorney General, Civil Division, Department of Justice, Washington, D.C.

**David B. Dixon**, Pillsbury Winthrop Shaw Pittman LLP, McLean, Va., for defendant-intervenor. With him was **Meghan D. Doherty**, Pillsbury Winthrop Shaw Pittman LLP, McLean, Va.

## O P I N I O N

**HORN, J.**

Protestor, Novak Birch, Inc. (Novak Birch), challenges the decision of the United States Department of Health and Human Services (HHS), Centers for Medicare & Medicaid Services (CMS), to take corrective action on Request for Quote Number HHSM-500-2016-RFQ-0035 (the solicitation), following the bid protest previously filed on the

---

[1] This opinion was issued under seal on June 14, 2017. The parties were asked to propose redactions prior to public release of the opinion. This opinion is issued with the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[Redacted]."

same solicitation, by Rainmakers Strategic Solutions, LLC (Rainmakers), <u>see</u> <u>Rainmakers Strategic Solutions, LLC v. United States</u>, Case No. 17-110C (Fed. Cl. April 11, 2017). In the earlier protest, Rainmakers challenged CMS's award of a task order contract to Novak Birch, the current protestor, for General Education and Outreach (GEO) services. The corrective action challenged in the above-captioned bid protest includes terminating the contract award to Novak Birch, cancelling the solicitation, and reevaluating how best to re-procure the desired services, including further market research and deciding on the appropriate contract vehicle for the acquisition.

<u>The Solicitation</u>

On July 28, 2016, CMS issued the solicitation requesting proposals for a task order contract under the General Services Administration (GSA) Professional Services Schedule 541, Advertising and Integrated Marketing Solutions, Category 541-5, Integrated Marketing Services. The solicitation explained that the purpose of the contract was to acquire

> technical professional services from a GEO [General Education and Outreach Contractor] to assist CMS with the development, execution, and assessment of multi-pronged education and outreach initiative [sic] designed to promote data transparency and prevent and reduce program integrity issues in CPI [Center for Program Integrity] initiatives such as Medicare, Medicaid, Children's Health Insurance Program (CHIP), Marketplace, and other programs.

According to the solicitation, the task order was "100% set aside for offerors identified as small businesses under the General Services Administration ('GSA') Professional Services Schedule, 00CORP, Schedule 541 Advertising & Integrated Marketing Solutions, Category 541-5 Integrated Marketing Services." The solicitation identified the following program goals for the GEO program:

a. Integration of program integrity intervention, education and outreach initiatives for a holistic and coordinated program integrity strategy throughout CPI initiatives;

b. Expanding education and outreach efforts to reach all relevant audiences and their stakeholders with the most timely and accurate education and outreach information;

c. Rapid response to vulnerabilities to contain and mitigate the vulnerability as quickly as possible;

d. Reducing improper payments caused by fraud, waste and abuse (FWA); and

e. Establishing greater transparency, stakeholder participation, and collaboration to improve and promote accountability, efficiency, and effectiveness in CMS programs.

Additionally, Section 5.0 of the solicitation set forth the GEO functional requirements, and required the contractor to possess, at a minimum, the following specialized expertise:

- Thorough understanding of Title XVIII of the Social Security Act;
- Thorough understanding of the Affordable Care Act;
- Thorough understanding and subject matter expertise of Titles I and II of the MMA, Medicare Advantage Organizations (MAOs) and Part D Prescription Drug (PD) programs;
- Knowledge of operations, management of MAOs and Part D sponsors;
- Knowledge of the Medicare Advantage and Part D Compliance Program Guidelines;
- Knowledge of prescribers, providers, pharmacies, pharmacy benefit managers (PBMs) operations and management and how they relate to Medicare Advantage and Part D;
- Thorough understanding of HIPAA and Privacy requirements; and
- Knowledge of PI initiatives . . . in CPI.

Prior to issuing the solicitation, CMS performed market research in order to determine if the GSA Schedule 541-5 contract could be used to meet CMS's GEO requirement. According to the Market Research Report, included in the administrative record, CMS researched the capabilities of the seven companies listed as small businesses on the GSA Schedule 541-5 contract, including Novak Birch, which included "reviewing websites, sources sought responses and Contractor Performance Assessment Reporting System (CPARS) reports where available." Regarding Novak Birch, the Market Research Report described Novak Birch as a "Good Candidate" and stated, "Novak Birch does not have healthcare experience. However, their overall ability to demonstrate their knowledge/experience in five of the nine categories, with particular strength in the event planning and executing would make them a good candidate for this procurement."[2] Novak Birch is a certified small business that offers marketing, event planning and management, web design, and copyrighting services. Based on the market research, when CMS issued the solicitation on July 28, 2016 for a GEO contractor, it solicited proposals through GSA's "e-Buy" platform from six small businesses identified as vendors under the GSA Schedule 541-5 contract, including Novak Birch.[3]

---

[2] The Market Research Report lists the following nine categories for the tasks outlined in the Statement of Work: "Intervention," "O&E [Outreach & Education] Materials," "O&E Event Support," "Training & Event Planning," "Video & Audio Services," "Teleconference Services," "Web Design & Maintenance," "Print & Mail Services," and "Healthcare Experience."

[3] At the time the solicitation was issued, Rainmakers' GSA Professional Services Schedule contract did not include Schedule 541, however, Rainmakers requested a modification of its GSA Professional Services Schedule contract to include Schedule 541-5 and GSA issued the modification prior to the proposal deadline, such that Rainmakers was eligible to submit a proposal. Although the market research considered the capabilities of the seven small businesses listed on the GSA Schedule 541-5 contract,

The solicitation combined the requirements of two previous contracts, including one which was being performed by Rainmakers, into a single contract. The solicitation explained that the task order would be awarded using a trade-off analysis to determine the best value for CMS. The solicitation contemplated the award of a time and materials contract to include one base year and two option years.

In the solicitation, offerors were instructed to submit their quotes in three volumes, including a technical quote, a business quote, and a conflict of interest quote. Within the technical quote, offerors were directed to describe their technical understanding and approach, personnel qualifications, management and staffing plan, past performance, and "508 Compliance." According to the solicitation, the offerors' technical quotes would be evaluated based on the relative importance of the following factors, in descending order of importance:

| Technical Evaluation Factors/ Sub-factors and Relevance | | | |
|---|---|---|---|
| 1 | Technical Understanding & Approach (Factor) | | |
| | a.  Education & Outreach Strategy, Advising and  Analysis (Sub-factor) | & | b.  Development and Launch of a Secure Website for Members (Sub-factor) |
| | c.  Outreach and Education Event Support: Staffing and  Facilitation (Sub-factor) | | |
| | d.  Outreach and Education Materials – Training Curriculum & Educational Presentation (Sub-factor) | | |
| | e.  Training and Event Planning and Execution – In  Person Event (Sub-factor) | & | f.  Training and Event Planning and Execution - Webinar (Sub-factor) |
| | g.  Training and Event Planning and Execution -  Exhibit Booth Staffing (Sub-factor) | | |
| | h.  Training and Event Planning and Execution – Event  Registration System (Sub-factor) | & | i.  Website Maintenance (Sub-factor) |
| 2 | Personnel Qualifications | | |
| 3 | Past Performance | | |
| 4 | Management and Staffing Plan | | |
| 5 | 508 Compliance (Acceptable/ Unacceptable) | | |

---

CMS concluded that one of the companies, [Redacted], "would not be a good candidate for this procurement," thus, CMS did not solicit a proposal from [Redacted].

Pursuant to the solicitation, CMS would assign an adjectival rating to each of the factors listed above as well as an overall adjectival rating for an offeror's technical quote. The possible adjectival ratings were "Exceptional," "Very Good," "Satisfactory," "Marginal," and "Unsatisfactory." (emphasis removed).

With regard to factor five, the "508 Compliance" factor, the solicitation stated: "[t]o be considered technically acceptable, the Offeror's proposed Electronic and Information Technology (EIT) supplies and/ or services must conform to applicable Section 508 accessibility standards. In making the determination of acceptability, CMS will review the Offeror's completed HHS Section 508 Product Assessment Template (PAT)." The solicitation stated further: "***Offerors shall include a copy of the PAT in their proposal submission.***" (emphasis in original). According to the solicitation, "[t]o receive a rating of Acceptable the Offeror must complete the PAT and demonstrate the Offeror's ability to meet the Section 508 standards. . . ."

As to the "Personnel Qualifications" factor, offerors were instructed to identify key personnel in their technical quotes. The solicitation listed the following as key personnel: "Senior Technical Advisor," "Project Director/Project Manager," "Web Specialist," "Graphic Designer," and "Outreach Coordinator." The solicitation stated that offerors would be evaluated on the proposed key personnel, to include, at a minimum:

1. Meeting SOW requirements;
2. Qualifications;
3. Previous experience related to projects of similar size and scope; and
4. Relevant training and experience the key personnel has had with outreach and event support dealing with Medicare, Medicaid and Marketplace programs and fraud, waste and abuse issues in healthcare.

The solicitation required offerors to propose key personnel who were "considered to be essential to work performance." The qualifications and duties of the Senior Technical Advisor included: "[k]nowledge of the requirements of this contract in order to provide technical support to CPI," "[p]rovide subject matter expertise on Medicare, Medicaid and other CMS programs' operations," "[p]rovide subject matter expertise on PI initiatives in CPI," and "[p]erform environmental scans to identify CPI program initiatives issues to determine outreach and education needs in order to develop outreach products and subjects for program integrity workgroups." In addition to the Senior Technical Advisor, offerors also were supposed to propose a Project Director/Project Manager with "[k]nowledge of the requirements of this contract and the ability to provide executive direction for the accomplishment of work under the contract," and, among other qualifications and duties, the "[k]nowledge, skills, and ability to plan, conduct, adhere to timelines, and supervise work to be contemplated under this contract." With regard to the other key personnel, the solicitation required the Web Specialist to possess extensive knowledge and experience developing, managing, and implementing a website. The Graphic Designer was required to have knowledge and experience generating visual media and assisting in the production of visual presentations. The Outreach Coordinator was required to have communications experience in public training and five years of experience planning and facilitating webinars, conferences, and trainings.

In addition to the technical quotes, Section 7.8 of the solicitation directed offerors to include in their business quotes all direct labor categories that the offerors intended to use, and "vendors had to provide a crosswalk/alignment of their proposed labor categories to their GSA Schedule labor categories." Section 7.8 also explained that the proposed labor rates for the labor categories could not exceed the rates reflected in each offerors' GSA Schedule 541-5 contract.

Although CMS solicited proposals from six small business vendors under GSA Schedule 541-5, Novak Birch and Rainmakers were the only two offerors to submit proposals in response to the solicitation. In their original proposals, Rainmakers' total proposed price was [Redacted], and Novak Birch's total proposed price was [Redacted].

CMS's Evaluation of Proposals

In its proposal, Novak Birch failed to include a 508 Product Accessibility Template (PAT), as required by the solicitation. Novak Birch tried to explain away the requirement by stating that, "as full technical and business requirements haven't been confirmed for the event registration system or the secure website, we cannot accurately or thoroughly complete a PAT at this time." Novak Birch stated that it would provide a PAT "[a]fter the contract is awarded, based on final technical and business requirements approved by CMS." Novak Birch's proposal stated:

> Our team will include 508 compliance expertise throughout the project lifecycle. We will implement 508-compliant solutions for the GEO website. We will work with the CMS Accessibility Standards team to review design specifications and wireframes, consult with developers and validate 508 compliance during the testing phase of each sprint. If required by CMS, the team will produce and update a 508 Product Accessibility Template (PAT) to outline compliance to 508 requirements.

During the evaluation of proposals, the three individual members of the CMS technical evaluation panel each gave Novak Birch adjectival ratings for the technical evaluation factors, including factor five, Section 508 Compliance. The first individual evaluator did not assign Novak Birch an adjectival rating for Section 508 Compliance and wrote the word "Question" on the technical evaluator worksheet next to the "Section 508 Compliance" line on the worksheet, which asked for a rating of "Acceptable/Unacceptable." The second individual evaluator assigned Novak Birch an adjectival rating of "Acceptable" with regard to Section 508 Compliance. The third individual evaluator did not assign Novak Birch an adjectival rating for Section 508 Compliance, and explained that "[a] review of Novak Birch's 508 Compliance Submission has been reviewed and determined to be Unacceptable."[4] Notwithstanding the various

---

[4] Inexplicably, the technical evaluation panel member who rated Novak Birch as "Acceptable" with regard to factor five, Section 508 Compliance, indicated that Novak Birch was "ACCEPTABLE," and stated the rating was based on "[t]he submission of the PAT (a copy must be included with proposal submission)." (capitalization in original). It is undisputed, and protestor agreed in open court, however, that Novak Birch did not submit

findings of the individual technical evaluation panel members, and the missing PAT from Novak Birch, in the technical evaluation panel's consensus report, the technical evaluation panel determined that Novak Birch's proposal met the solicitation requirements for the Section 508 Compliance factor "to obtain an Acceptable rating." According to the technical evaluation panel report:

> The 508 section of the contract was reviewed by the compliance officer and finds Novak Birch's 508 compliance to be acceptable. The contractor indicated that they would fill out a PAT as soon as sufficient details were supplied for them to do so. The compliance officer spoke with the Contracting Officer and they agreed this would be acceptable, provided that Novak Birch complete a PAT when more information is given. Throughout Novak Birch's proposal, references are made to the importance of making materials and webinars Section 508 compliant.

Also, in its proposal, Novak Birch identified the labor categories from its GSA Schedule 541-5 contract that it would rely on to fulfill the key personnel positions for the contract. Novak Birch explained the "crosswalk" for the GSA labor categories it intended to use as follows:

| GEO LABOR CATEGORY | GSA Labor Category |
| --- | --- |
| Senior Technical Advisor | "this labor category cross walks to the Novak 'Account service, planning, project management'" |
| Project Manager | "this labor category cross walks to the Novak 'Account service, planning, project management'" |
| Graphic Designer | "Concept & Design & Production" |
| Outreach Coordinator | "this labor category cross walks to the Novak 'Public Relations'" |

As the table depicts, it appears that Novak Birch did not clearly indicate which GSA Schedule 541-5 labor category it would employ to satisfy the Web Specialist key

_____

a PAT. There is no further explanation for the second panel member's conclusion that Novak Birch was "Acceptable," or for any other member's determination or change of mind.

personnel position. With regard to the Web Specialist key personnel position, the contracting officer noted that Novak Birch's proposal

> did not provide a crosswalk with their business proposal narrative and there was no other area in which the CO [contracting officer] could determine specifically what GSA labor category crosswalked to the Web Specialist. The CO did make the assumption for review purposes that the Web Specialist was crosswalked to Novak's GSA Labor Category of Web site design / Interactive / Programming/IT Support. Verification was required and the CO confirmed that the Web Specialist is crosswalked to Novak's GSA Labor Category of Web site design / Interactive / Programming/IT Support.

Like Novak Birch, Rainmakers also identified the labor categories from its GSA Schedule 541-5 contract that it would rely on to fulfill the key personnel positions for the contract. Rainmakers' proposal included the following "crosswalk" of its GSA labor categories with the GEO labor categories and rates and the key personnel labor categories:

| GEO LABOR CATEGORY | GSA Labor Category | GSA Rate |
|---|---|---|
| Senior Technical Advisor | Subject Matter Expert II | $182.72 |
| Project Director | Partner/Principal II | $182.72 |
| Web Specialist Lead | Subject Matter Expert II | $182.72 |
| Graphics Designer 2[5] | Functional Specialist I | $118.68 |
| Graphics Designer 3 | Senior Associate II | $158.57 |
| Deputy Project Director/ Outreach Coordinator | Senior Associate I | $152.58 |

With regard to the Graphic Designer position, the contracting officer noted that for Rainmakers "there was no certain way to determine if the proposed Key Personnel 'Graphic Designer' is crosswalked to a Graphic Designer 2 or Graphic Designer 3" of Rainmakers' GSA Schedule 541-5 contract.

---

[5] Rainmakers did not identify which of the two proposed Graphic Designer labor categories was intended to satisfy the key personnel requirement.

As part of the evaluation of proposals, the contracting officer evaluated the offerors' proposed key personnel to determine if the services and labor categories proposed were within the scope of the GSA Schedule 541-5 contracts held by Rainmakers and Novak Birch. The contracting officer determined that the GSA Schedule 541-5 labor categories that Rainmakers proposed for the key personnel positions did not align with the solicitation requirements, and, as a result, Rainmakers' proposal was found unacceptable. The contracting officer's analysis focused on "the alignment to the Key Personnel" with the offerors' proposed GSA Schedule 541-5 labor categories, and the specific education, experiences, duties, and responsibilities of the five key personnel listed in the solicitation. As a result of the analysis, the contracting officer determined that, of the five key personnel, only one of the five proposed by Rainmakers, the Project Director, was considered to be within the scope of Rainmakers' GSA Schedule 541-5 contract. The contracting officer "made the determination that the services of Rainmakers' proposed GSA labor categories, as aligned to the Key Personnel of the requirements of the RFQ [Request for Quote] SOW [Statement of Work], were not offered or within scope of the labor categories identified in their GSA schedule contract for four of the five proposed Key Personnel." According to the contracting officer, "Rainmakers' GSA schedule contract did not include labor categories, based on their descriptions in the GSA contract that would align with the Key Personnel Requirements." Specifically, with regard to the Web Specialist key personnel position, the contracting officer determined that the "Subject Matter Expert II" GSA Schedule labor category that Rainmakers proposed "did not provide the attributes, services and duties required to meet the needs of the SOW" for the Web Specialist key personnel position. According to the contracting officer, "[n]one of the SME [Subject Matter Expert] II requirements can be associated with any of the duties of the Web Specialist as outlined in the SOW."

Similarly, the contracting officer determined that, with regard to the Outreach Coordinator key personnel position, the functional responsibilities of the proposed "Senior Associate I" GSA Schedule 541-5 labor category did not align with the solicitation requirements. According to the contracting officer, "[n]one of the Senior Associate I requirements can be associated with any of the requirements of the OC [Outreach Coordinator] as outlined in the SOW, including: 'communications experience in public training' and 'experience planning and facilitating webinars, conferences and trainings.'" As a result, the contracting officer concluded that the Outreach Coordinator services required by the solicitation were "not offered as part of Rainmakers' GSA schedule contract." (emphasis removed).

As to the Senior Technical Advisor key personnel position, the contracting officer explained that "Rainmakers crosswalked the required Key Personnel 'Senior Technical Advisor' to their GSA schedule contract labor category of 'Subject Matter Expert (SME) II,'" but the Subject Matter Expert II labor category "from the GSA contract did not provide the attributes, services and duties required to meet the needs of the SOW." The contracting officer compared the requirements in the solicitation for the Senior Technical Advisor with the description of the Subject Matter Expert II GSA Schedule 541-5 labor category and concluded that the attributes and responsibilities of the Subject Matter Expert II labor category do not align with the requirements in the solicitation for the Senior Technical Advisor. Thus, the contracting officer determined that the Senior Technical

Advisor services required by the solicitation were "not offered as part of Rainmakers' GSA schedule contract." (emphasis removed).

The contracting officer also assessed whether Rainmakers' proposed GSA Schedule 541-5 labor category for the Graphic Designer key personnel position would align with the solicitation requirements. As noted above, in its proposal, Rainmakers indicated two GSA Schedule labor categories for the Graphic Designer position: "Functional Specialist I" and "Senior Associate II." The contracting officer compared the requirements in the solicitation for the Graphic Designer, which included experience generating visual media and assisting in the production of various visual aid materials, with the responsibilities of the "Functional Specialist I," which included tasks related to "business process reengineering, statistical process control" and "strategic and business planning." The contracting officer concluded that the functional responsibilities of the "Functional Specialist I" did not align with the Graphic Designer position. Similarly, the contracting officer compared the Graphic Designer requirements with the responsibilities of a "Senior Associate II," which included consulting or managing tasks for multiple projects across various industries and ensuring contract compliance, and found that the proposed labor category did not align with the duties of the Graphic Designer. Accordingly, the contracting officer determined that Graphic Designer services were "not offered as part of Rainmakers' GSA schedule contract." (emphasis removed).

The contracting officer also concluded that Rainmakers used:

the GSA labor category of "Subject Matter Expert II" to fulfill two different Key Personnel roles (Senior Technical Advisor and Web Specialist) and the GSA labor category of "Senior Associate I" and "Senior Associate II" to fulfill two other different Key Personnel roles (Outreach Coordinator and Graphic Designer, respectfully) when all these Key Personnel roles have functions, duties and services that are very distinct and cannot be categorized under one general labor category.

The contracting officer determined that the proposed "Partner/Principal II" labor category in Rainmakers' proposal "was the only labor category from the GSA contract that did provide the attributes, services and duties required to meet the needs of the SOW." The contracting officer concluded that "the attributes and responsibilities of the GSA Partner/Principal II labor category . . . align with the attributes and responsibilities of the Project Director in accordance with the GEO SOW Section 8.0 Key Personnel" and "determined these services to be offered as part of Rainmakers' GSA schedule contract." (emphasis removed).

Having determined that "[b]ased on the scope analysis . . . the quoted services are not available on Rainmakers' GSA Schedule Contract," the contracting officer concluded that the services sought in the solicitation could not be purchased from Rainmakers "using FAR Part 8 and as such are unacceptable." The contracting officer explained that she did "not foresee a remedy in which Rainmakers can revise their proposal in order to become

acceptable." As a result, Rainmakers was removed from the competition, and the contracting officer did not further consider Rainmakers' proposal.[6]

The contracting officer conducted a similar analysis of Novak Birch's proposal and the GSA Schedule labor categories that Novak Birch proposed to satisfy the key personnel positions. The contracting officer compared the GSA schedule labor category descriptions with the solicitation requirements for each of the key personnel positions and, unlike the assessment of Rainmakers' proposal, the contracting officer concluded that the GSA Schedule 541-5 contract labor categories proposed for each key personnel position in Novak Birch's proposal aligned with the attributes and responsibilities of the key personnel positions. The contracting officer "made the determination that the services of Novak Birch's proposed GEO labor categories, as aligned to the Key Personnel of the requirements of the RFQ SOW, were within [the] scope of the labor categories identified in their GSA schedule contract for five of the five proposed Key Personnel." As a result, the contracting officer concluded that Novak Birch's proposed GSA Schedule 541-5 contract labor categories offered the services required by the solicitation.

Although the contracting officer concluded that Novak Birch's proposed GSA Schedule 541-5 labor categories aligned with the key personnel requirements in the solicitation, the contracting officer also found that the hours that Novak Birch proposed to perform the work under the task order were "not adequate for the various tasks listed in the Statement of Work (SOW)," and that "the proposed labor categories and hours proposed" by Novak Birch were "significantly low." The contracting officer explained that, according to the technical evaluation panel:

> It is questionable that the Offeror will be able to fulfill the objectives of this contract in a timely manner given their proposed hours for direct labor. Although subcontractors/consultants will be completing a great deal of work, the lack of direct labor hours proposed by the subcontractors/consultants does not offer the government any greater assurance of successful project completion.

> The TEP [technical evaluation panel] recommends additional hours as they believe, based on their assessment, that the subcontractor labor categories are essential; however, the hours are significantly underestimated to successfully complete the requirements of the proposed contract.

Based on the assessment of Novak Birch's proposal, the contracting officer recommended that additional information be requested from Novak Birch "as well as a recommendation of increased labor hours in order to make a GSA order award decision." Additionally, the contracting officer determined that Novak Birch proposed labor rates for

---

[6] Although the contracting officer deemed Rainmakers' proposal "unacceptable because of the misalignment of labor categories," a review of the administrative record indicates that the technical evaluation panel reviewed Rainmakers' proposal and assigned it an overall rating of [Redacted].

non-key personnel positions that exceeded the labor rates in Novak Birch's GSA Schedule 541-5 contract.

After the contracting officer compared the offerors' proposals and determined that Rainmakers' proposal was unacceptable due to the non-alignment of the proposed GSA Schedule 541-5 labor categories, the contracting officer began exchanges with Novak Birch concerning issues that CMS had found problematic with Novak Birch's proposal. During these exchanges, CMS asked for clarification and additional information from Novak Birch. For example, CMS informed Novak Birch that "[s]ome of the crosswalks do not match" and asked Novak Birch to "please provide the exact GSA labor category crosswalk based on Novak Birch's GSA Schedule for all proposed labor categories." CMS also notified Novak Birch that certain proposed rates exceeded the GSA labor rate schedule. CMS asked Novak Birch to "[p]lease clarify who is fulfilling the role of the Key Personnel Requirement of Project Director," and stated "[t]he Offeror proposes the use of subject matter experts (SMEs), and yet this labor category does not appear to be listed on the labor category list. Please update your Business Proposal to address the lack of SMEs proposed." CMS also proposed that "the Offeror update their Business Proposal to reflect a more accurate depiction of the work as reflected in the SOW" because "the level of effort required to support the 21 non-CMS and 24 CMS events is significantly higher than what the Offeror included in the original business proposal." In addition, CMS identified the hours for the following labor categories as underestimated in Novak Birch's proposal: "Project Director (GSA- Account Service)," "Project Manager- Creative," "Project Manager- Events," "Graphic Designer," "Art Production/Director," "Outreach Specialist, Junior," "Instructional System Designer," "Senior Technical Advisor – Account service, planning, project management," "Outreach Coordinator – Public relations," "Technical Writer/Sr. Editor – Copy writing/editing."

After the exchanges between CMS and Novak Birch occurred, Novak Birch submitted a revised proposal on September 26, 2016 to address the questions and concerns identified by CMS during the exchanges, which resulted in an increase in Novak Birch's total proposed price from [Redacted] to $40,945,590.00, as compared to Rainmakers' proposed price of [Redacted]. During the exchanges with Novak Birch, CMS did not identify Novak Birch's lack of a Section 508 Compliance PAT as an issue, even though both Novak Birch's original and revised proposals did not contain a Section 508 Compliance PAT. The parties have stipulated that "[t]he Section 508 language in Novak's revised proposal is identical to the Section 508 language in Novak's original proposal."

<u>Contract Award Decision and Subsequent Bid Protest</u>

The contracting officer determined that Novak Birch, at its elevated price, represented the best value to the government, and CMS awarded the task order contract to Novak Birch on September 29, 2016. Subsequently, on September 30, 2016, Rainmakers received formal notice that it was not selected for the task order contract. Following the task order contract award, Rainmakers filed a bid protest at the Government Accountability Office (GAO) challenging the award of the task order contract to Novak Birch. <u>See</u> <u>generally</u> <u>Rainmakers Strategic Sols. LLC</u>, B-413938.1 et al. (Jan. 4, 2017). The GAO held an alternative dispute resolution conference with the parties on December

23, 2016, during which the GAO attorney assigned to the bid protest explained to the parties that Rainmakers' complaint regarding eligibility to compete for the task order would likely be denied, but that there were concerns with respect to the agency's evaluation of Novak Birch's proposal under the Section 508 compliance evaluation factor. Following the conference, CMS advised the GAO that it intended to take corrective action. Specifically, CMS intended to reopen negotiations with Novak Birch and to request the submission of a Section 508 PAT. According to CMS, if Novak Birch submitted a Section 508 PAT, and the agency evaluated the PAT as acceptable, CMS would affirm the contract award to Novak Birch. Rainmakers objected to CMS's corrective action, however, the GAO determined that CMS's corrective action was unobjectionable. As a result, GAO concluded that the CMS's "corrective action renders the protest academic" and dismissed the GAO bid protest.

After the GAO protest was dismissed, CMS reopened exchanges with Novak Birch to address the Section 508 Compliance issue and to request a PAT from Novak Birch. Novak Birch provided a PAT to CMS, and CMS found the PAT to be acceptable. Thereafter, on January 19, 2017, CMS reaffirmed the task order contract award to Novak Birch.

Subsequently, Rainmakers filed a complaint in this court challenging the task order contract award to Novak Birch, arguing that CMS's evaluation of the proposals, and CMS's corrective action to allow Novak Birch to submit a PAT, were arbitrary and capricious and not in accordance with the law. See Rainmakers Strategic Sols., LLC v. United States, Case No. 17-110C. As the contract awardee, Novak Birch moved to intervene in the protest as a defendant-intervenor, and the court granted the request. The parties in Rainmakers Strategic Solutions, LLC v. United States filed cross-motions for judgment on the administrative record, and oral argument was held. After oral argument, and after discussions between all of the parties and the court regarding identified concerns with how the procurement process had been conducted and the resulting contract award to Novak Birch, on March 31, 2017, the government filed another notice of corrective action, indicating that "the U.S. Department of Health and Human Services, Centers for Medicare & Medicaid Services (CMS) intends to take corrective action in connection with this bid protest."[7] CMS described this corrective action as follows:

> CMS intends to terminate the award to Novak Birch, Inc. (Novak), and cancel Request For Quote number HHSM-500-2016-RFQ-0035. CMS then intends to reprocure the desired services after conducting market research to determine an appropriate contract vehicle for obtaining these

---

[7] On March 31, 2017, defendant filed its notice of corrective action together with a partially unopposed motion to suspend briefing in Rainmakers Strategic Solutions, LLC v. United States, indicating that CMS intended to take corrective action and requesting the extension of all deadlines in the matter. The court granted defendant's request to extend the parties' deadlines for filing supplemental briefs, and ultimately dismissed, based on the parties' joint stipulation of dismissal, the bid protest brought by Rainmakers on April 11, 2017.

services . . . . CMS will implement this corrective action after the opening of business on April 4, 2017.

Thereafter, on April 4, 2017, CMS issued a modification terminating Novak Birch's contract "for the convenience of the Government," and directing Novak Birch to immediately stop work. In a memorandum dated April 4, 2017, the contracting officer explained:

> The purpose of this modification is to terminate the contract, in whole, for the convenience of the Government, pursuant to contract clause 52.212-4, Alternate I, (I). This course of actions is a result of the Notice of Corrective Action and Partially Unopposed Motion to Suspend Briefing submitted to the Court of Federal Claims on March 31, 2017 (see e-file N.1) and ordered by Court of Federal Claims Judge, Marian Horn, on March 31, 2017 (see e-file N.1), in the case of Rainmakers Strategic Solutions, LLC vs. United States (Case 1:17-cv-00110-MBH).

Also on April 4, 2017, the contracting officer issued a notice to inform the offerors, Novak Birch and Rainmakers, that the solicitation, RFQ HHSM-500-2016-RFQ-0035, was cancelled.

Three days after CMS terminated Novak Birch's contract and cancelled the solicitation, the contracting officer memorialized the corrective action in a memorandum dated April 7, 2017. In the memorandum, the contracting officer explained that the "continual protests since October 2016 for this requirement . . . has exposed what are now viewed as issues with the procurement that are best addressed through corrective action." The contracting officer "determined that the best corrective action is to terminate the existing GEO task order to Novak Birch, cancel the GEO Request for Quote (RFQ), reassess the procurement strategy to determine a more appropriate vehicle for obtaining the GEO services, then obtain the GEO services." The contracting officer provided two reasons that the corrective action was "the best course of action for the Government." First, the contracting officer stated that CMS had concluded "that using the GSA schedule to procure the GEO services was not the most strategic method or in the government's best interests." According to the contracting officer, "[h]aving only one quoter [Novak Birch] eligible through GSA is not the outcome CMS desired. Adequate competition for the services is more advantageous to the Government in order to receive the best value." The contracting officer explained that she elected to use the GSA Schedule 541-5 contract based on market research, however, as a result of the bid protest process, CMS "has come to realize that due to the complex nature of the requirement and the newness of the majority of the services being procured, the narrowness of the GSA schedule was not the most successful method." Second, the contracting officer explained that "the Government Accountability Office (GAO) protest and the subsequent COFC [Court of Federal Claims] protest have led me to reconsider Novak Birch, Inc.'s (Novak Birch) eligibility for award of the GEO task order," and these protests have "made it apparent that there is significant risk of a decision from the COFC that Novak Birch is ineligible for award due to its omission of a Section 508 PAT from its quote." The contracting officer explained that, because Rainmakers and Novak Birch were the only two offerors to submit

proposals in response to the solicitation, and because Rainmakers was found to be ineligible for award during the proposal evaluations, the elimination of both offerors would leave "CMS without a vendor to perform the requirement." According to the contracting officer,

> [e]liminating both vendors from the competition (and leaving CMS with no eligible awardees) is most appropriate. Nothing I have seen to date has changed my view that my determination that Rainmakers is not eligible for award because it did not offer the services CMS was procuring on its GSA schedule contract was incorrect. Therefore, reopening discussions with Rainmakers to allow it to cure its schedule issues seems unnecessary and would most likely result in additional bid protest litigation. However, I do now see the increased risk associated with Novak Birch not submitting the PAT, even considering that the PAT submission requirement is one part of an evaluation factor that ranked fifth in relevance for the overall technical quote. The instructions to quoters used the term "technically acceptable" and the Technical Evaluation Panel rated Novak Birch as "Acceptable" even though the evaluation criteria clearly stated that this rating could only be assigned to a vendor that submitted a completed PAT, which Novak Birch did not.

Having recognized these issues with the procurement, the contracting officer stated that, "[i]n order to move forward in acquiring the needed services, to avoid the waste of resources on further litigation, in recognition that the GSA schedule has proven not to be the most advantageous procurement vehicle, and to better ensure that CMS will receive the best value in the procurement of the GEO services," the agency will take corrective action and consider "alternative methods of procuring the services by reassessing the best procurement strategy to allow the Government to get the best value."

On April 11, 2017, after discussions during oral argument and after the agency indicated it would take corrective action, and after the contracting officer had executed her corrective action memorandum, the parties in Rainmakers Strategic Solutions, LLC v. United States filed a joint stipulation of dismissal with prejudice. See Rainmakers Strategic Sols., LLC v. United States, Case No. 17-110C (Fed. Cl. April 11, 2017). The parties stipulated and agreed that, "after briefing by the parties and a hearing on the merits, and after corrective action taken by the agency upon the contracting officer's reconsideration of the procurement in light of the protests brought by plaintiff . . . the plaintiff's action against the United States shall be, and hereby is, dismissed with prejudice." Accordingly, Rainmakers Strategic Solutions, LLC. v. United States was dismissed by this court on April 11, 2017, and judgment was entered.

<u>Novak Birch's Current Bid Protest to Challenge CMS's Most Recent Corrective Action Decision</u>

On April 21, 2017, protestor, Novak Birch, filed the above-captioned bid protest, Case No. 17-559C, challenging CMS's second decision to take corrective action and seeking a preliminary and a permanent injunction "requiring Defendant to refrain from taking any action to implement Defendant's proposed arbitrary and capricious corrective action plan." In response to protestor's complaint, Rainmakers moved to intervene as a defendant-intervenor, which the court granted. The parties have filed cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC) (2016).[8]

## DISCUSSION

This court has jurisdiction to hear bid protests pursuant to 28 U.S.C. § 1491(b)(1) (2012) of the Tucker Act, which provides that the court has

> jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1); <u>see</u> <u>also</u> <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d 1352, 1359 (Fed. Cir. 2009). The Administrative Dispute Resolution Act of 1996 (ADRA), (codified at 28 U.S.C. § 1491(b)(1)–(4) (2012)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. <u>See</u> <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001). Furthermore, the United States Court of Appeals for the Federal Circuit has established that this court has jurisdiction over a bid protest based on an agency's

---

[8] Protestor's motion for a preliminary injunction is subsumed by this court's consideration of the parties' cross-motions for judgment on the administrative record and the court's determination on the merits, pursuant to RCFC 65(a)(2)(2016). <u>See</u> RCFC 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing." <u>Alion Sci. & Tech. Corp. v. United States</u>, 69 Fed. Cl. 14, 21 (2005) ("This consolidation of the preliminary injunction with a determination on the merits is what is contemplated in the court's Rule 65."); <u>see</u> <u>also</u> <u>OTI Am., Inc. v. United States</u>, 68 Fed. Cl. 646, 661 n.21 (2005) ("In accord with RCFC 65(a)(2), [protestor's] renewed motion for a preliminary injunction is subsumed within this action on [protestor's] request for a permanent injunction."); <u>J.C.N. Constr. Co., Inc. v. United States</u>, 60 Fed. Cl. 400 (2004) ("Pursuant to Rule 65(a)(2) of Rules of the Court of Federal Claims . . . a hearing on plaintiff's application for a preliminary injunction was consolidated with a hearing on the merits of the claim for an injunction and the cross-motions for judgment upon the administrative record.").

decision to take corrective action. See Sys. Application & Tech., Inc. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012) ("This court has made clear that bid protest jurisdiction arises when an agency decides to take corrective action even when such action is not fully implemented."); see also Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 937-38 (Fed. Cir. 2007); Jacobs Tech. Inc. v. United States, 131 Fed. Cl. 430, 444 (2017) ("[T]he court's bid protest jurisdiction includes the review of a procuring agency's decision to take corrective action."). The parties do not dispute, and the court independently concludes, that protestor's challenge in the above-captioned bid protest to CMS's corrective action decision is subject to this court's bid protest jurisdiction.

In order to have standing to sue as an "interested party" under the Tucker Act, a disappointed bidder must show that it suffered competitive injury or was "prejudiced" by the alleged error in the procurement process. See Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011) (To prevail, a bid protester must first "'show that it was prejudiced by a significant error' (i.e., 'that but for the error, it would have had a substantial chance of securing the contract).'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378, 1380 (Fed. Cir. 2009)); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1317 (Fed. Cir. 2007); see also Sci. Applications Int'l Corp. v. United States, 108 Fed. Cl. 235, 281 (2012); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 693 (2010) ("In order to establish standing to sue, the plaintiff in a bid protest has always needed to demonstrate that it suffered competitive injury, or 'prejudice,' as a result of the allegedly unlawful agency decisions." (citing Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006); Statistica, Inc. v. Christopher, 102 F.3d 1577, 1580–81 (Fed. Cir. 1996); Vulcan Eng'g Co. v. United States, 16 Cl. Ct. 84, 88 (1988); Morgan Bus. Assocs., Inc. v. United States, 223 Ct. Cl. 325, 332 (1980))). In order to establish what one Judge on this court has called "allegational prejudice" for the purposes of standing, the bidder must show that there was a "substantial chance" it would have received the contract award, but for the alleged procurement error. See Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 675; Hyperion, Inc. v. United States, 115 Fed. Cl. 541, 550 (2014) ("The government acknowledges that proving prejudice for purposes of standing merely requires "allegational prejudice," as contrasted to prejudice on the merits . . . ."); Bannum, Inc. v. United States, 115 Fed. Cl. 148, 153 (2014); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1358 (Fed. Cir. 2005); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1331 (Fed. Cir.), reh'g denied (Fed. Cir. 2004); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Statistica, Inc. v. Christopher, 102 F.3d at 1581; Archura LLC v. United States, 112 Fed. Cl. 487, 497 (2013); Lab. Corp. of Am. v. United States, 108 Fed. Cl. 549, 557 (2012). Because standing is a jurisdictional issue, this showing of prejudice is a threshold issue. See Corus Grp. PLC. v. Int'l Trade Comm'n, 352 F.3d 1351, 1357 (Fed. Cir. 2003); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002).

In the context of a pre-award bid protest, the United States Court of Appeals for the Federal Circuit has determined that to show the requisite "direct economic interest," and, therefore, to be an "interested party" under the Tucker Act, the protestor has to have suffered a "'non-trivial competitive injury which can be redressed by judicial relief.'" See Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (quoting Weeks

Marine, Inc. v. United States, 575 F.3d at 1362–63); see also COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1383 n.7 (Fed. Cir. 2012) ("[I]n Weeks Marine this court specifically held that the 'non-trivial competitive injury' standard was applicable to 'a pre-award protest.'" (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362)) (emphasis in original); MVS USA, Inc. v. United States, 111 Fed. Cl. 639, 647 (2013); Miles Constr., LLC v. United States, 108 Fed. Cl. 792, 797 (2013). This is a lower standard than the "substantial chance" standard used in post-award bid protests, but still requires a "showing of some prejudice." Orion Tech., Inc. v. United States, 704 F.3d at 1348-49 (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362) (emphasis in original).

In the above-captioned bid protest, neither defendant nor defendant-intervenor dispute Novak Birch's standing to challenge the corrective action decision now at issue before this court. As noted above, Novak Birch was the contract awardee that had its contract terminated as a result of CMS's decision to take corrective action in response to the earlier filed bid protest. See Rainmakers Strategic Solutions, LLC v. United States, Case No. 17-110C. In the above-captioned bid protest, Novak Birch, now appearing as the protestor, challenges the most recent corrective action decision, and has established that it is an interested party with standing to challenge CMS's corrective action decision because, as the contract awardee and terminated contractor, it has sufficiently alleged a direct economic interest in the underlying procurement and the decision to take corrective action. See Sys. Application & Techs., Inc. v. United States, 100 Fed. Cl. 687, 720 (2011).

Turning to the parties' cross-motions for judgment on the administrative record, RCFC 52.1(c) governs motions for judgment on the administrative record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d at 1356–57)); see also Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010).

The Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996), provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'"); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369

F.3d 1324, 1329 (Fed. Cir. 2004) (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319.

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir. 2013) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350–51 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057–58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000)), aff'd, 365 F.3d 1345 (Fed. Cir. 2004)))), reh'g and reh'g en banc denied (Fed. Cir. 2013) (alterations in original). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D) (2012);[9] see also Tinton Falls Lodging Realty, LLC v.

---

[9] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d at 1358; Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1312 ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (internal citations omitted); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), reh'g and reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement

---

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

procedure involved a violation of a regulation or procedure.") (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285–86); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531–32 (2010) ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285–86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)). "'"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v.

Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

> Stated otherwise by the United States Supreme Court:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977) (internal citations omitted); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6–7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004), and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal withdrawn, 559 F. App'x 1033 (Fed. Cir. 2014) (internal citations omitted); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. 369, 382 (2013); Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 392 (1999) ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743–44 (1985))), appeal dismissed, 6 F. App'x 867 (Fed. Cir. 2001), and superseded by regulation as recognized in MVS USA, Inc. v. United States, 111 Fed. Cl. 639 (2013).

According to the United States Court of Appeals for the Federal Circuit:

> Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Furthermore, according to the Federal Circuit:

> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also Weeks Marine, Inc. v. United States, 575 F.3d at 1368–69 ("We have stated that procurement decisions 'invoke[ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

On a motion for judgment on the administrative record, a disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence.  See Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1364; see also Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995–96; Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340.  The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is

arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion. . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. 487, 496 (2013). To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial.") ; Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 694-96. In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'") (citation omitted).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000);

Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corp. v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.  This is a refinement and clarification of the "substantial chance" language of CACI, Inc.-Fed. [v. United States], 719 F.2d at 1574.

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1996); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum . . . .  To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Statistica, Inc. v. Christopher, 102 F.3d at 1581; Data Gen. Corp. v. Johnson, 78 F.3d at 1562); see also Todd Constr., L.P. v. United States, 656 F.3d at 1315; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (using a "reasonable likelihood" rule); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1380 (using a "substantial chance" test); Archura LLC v. United States, 112 Fed. Cl. at 496 (using a "substantial chance" test); Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 96 (2006) (using a "substantial chance" test), recons. in part, 75 Fed. Cl. 406 (2007).

When a bid protest at this court challenges an agency's corrective action decision, this court should only set aside an agency's action that is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d at 938 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057); see also Raytheon Co. v. United States, 121 Fed. Cl. 135, 150 (2015) ("As in all bid protests, the court reviews a decision to take corrective action pursuant to the standards set forth in the Administrative Procedure Act ('APA') . . . and will set aside the decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004) (quoting 5 U.S.C. § 706(2)(A) (2012)).").

"A contracting agency has broad discretion whether to pursue corrective action during the course of a procurement."[10] Wildflower Int'l, Ltd. v. United States, 105 Fed. Cl. 362, 385-86 (2012); see also Sys. Application & Techs., Inc. v. United States, 100 Fed. Cl. at 716 ("As with all procurement decisions, an agency has broad discretion to take necessary corrective action. Accordingly, the court affords the Army's decision to take corrective action deference and will uphold the decision if it is rational, reasonable, and coherent and reflects due consideration of all relevant facts." (internal citations omitted)); Jacobs Tech. Inc. v. United States, 100 Fed. Cl. 186, 190 (2011) ("Contracting officers are entitled to broad discretion in the procurement process . . . including in their decisions to take corrective action."); ManTech Telecomm. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 65 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002) ("Regarding the use of corrective action, this court has held that '[c]ontracting officials in negotiated procurements have broad discretion to take corrective action where the agency determines that such action is necessary to ensure fair and impartial competition.'") (internal citations omitted). To be reasonable, "the agency must have 'examined the relevant data and articulated a coherent and reasonable explanation for [its] decision'" to take corrective action. See Jacobs Tech. Inc. v. United States, 131 Fed. Cl. at 450 (quoting WHR Group, Inc. v. United States, 115 Fed. Cl. 386, 396 (2014)) (modification in original). In assessing whether to take corrective action, "[t]he contracting agency does not have to 'admit an error' prior to its decision to pursue corrective action." Wildflower Int'l, Ltd. v. United States, 105 Fed. Cl. at 386; see also ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. at 72 ("[I]t is important to recall that the government is not obliged to admit an error as a precondition to proposing corrective action."); Ceres Gulf, Inc. v. United States, 94 Fed. Cl. 303, 318 (2010) ("The contracting officer need not identify a particular error in the procurement process as a precondition to proposing corrective action." (internal citations and quotations removed)).

To determine whether the scope of a corrective action was reasonable under the circumstances and appropriate to remedy the impropriety, the court must conduct a fact-specific review. See Prof'l Serv. Indus., Inc. v. United States, 129 Fed. Cl. 190, 203 (2016) ("Given the broad discretion afforded agencies in the bid protest arena, the great weight of authority is that to survive review, an agency's corrective action must be 'reasonable under the circumstances and appropriate to remedy the impropriety.' Amazon Web Servs., Inc., v. United States, 113 Fed. Cl. 102, 115 (2013) (quoting Reema Consulting Servs., Inc. v. United States, 107 Fed. Cl. 519, 527 (2012)).") see also Wildflower Int'l, Ltd. v. United States, 105 Fed. Cl. at 389; Jacobs Tech. Inc. v. United States, 131 Fed. Cl. at 443-44. In Jacobs Technology Inc. v. United States, a Judge of this court stated that "[r]eviewing courts have not been fully consistent in applying this reasonableness standard" to an agency's corrective action, and compared two prior decisions of this court. See Jacobs Tech. Inc. v. United States, 131 Fed. Cl. at 450. The Jacobs Technology

---

[10] Quoting the appellant's brief, the United States Court of Appeals for the Federal Circuit noted that "'corrective action' in the bid protest context generally means 'agency action, usually taken after a protest has been initiated, to correct a perceived prior error in the procurement process, or, in the absence of error, to act to improve the competitive process.'" Dellew Corp. v. United States, 855 F.3d 1375, 1378 n.2 (Fed. Cir. 2017).

court reviewed Sheridan Corp. v. United States, 95 Fed. Cl. 141, 153 (2010), in which the court, while embracing the "reasonable under the circumstances" test, went further and stated "the corrective action must target the identified defect" in order to be found reasonable, and Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 750 (2012), in which the court noted that the Sheridan test was too restrictive for its case, and stated, that "[t]he Court of Federal Claims has more or less settled on a standard for review of challenges to corrective actions. It must be reasonable under the circumstances." In WHR Group, Inc. v. United States, 115 Fed. Cl. at 397, the court similarly noted the earlier, different approaches in Sheridan Corp. and Sierra Nevada Corp. and held that "there can be no universal test as to what constitutes appropriate corrective action," and embraced the "reasonable under the circumstances" test. Id. A review of the court's decisions demonstrates that varying approaches continue to be taken when reviewing the reasonableness of an agency's corrective action. Following the Sheridan Corp. decision, in Amazon Web Services, Inc. v. United States, 113 Fed. Cl. at 115, the court held that "even where a protest is justified, any corrective action must narrowly target the defects it is intended to remedy." Id. In Wildflower International, Ltd. v. United States, the court held that "[c]orrective action is reasonable when it is "rationally related to the defect to be corrected." Wildflower Int'l, Ltd. v. United States, 105 Fed. Cl. at 389; see also Excelsior Ambulance Serv. v. United States, 124 Fed. Cl. 581, 585 (2015) ("To be reasonable, the agency's corrective action must be rationally related to the defect to be corrected."). In Professional Service Industries, Inc. v. United States, 129 Fed. Cl. at 203, however, another Judge on this court explained that "it would not be appropriate to apply a narrow targeting or tailoring requirement to an agency's decision to take corrective action" because "protested procurement actions are reviewed under a deferential reasonableness standard" and "[l]egal standards that impose narrow tailoring or narrow targeting requirements on government action are employed in cases where courts apply heightened scrutiny to such actions." Id.  The court in Professional Service Industries, Inc. v. United States considered whether the agency's corrective action was "reasonable under the circumstances and whether it [was] supported by the administrative record." Id. Similarly, in Manus Medical, LLC v. United States, 115 Fed. Cl. 187, 192 (2014), the court held that "corrective action must still be 'reasonable under the circumstances and appropriate to remedy the impropriety.'" Id. (quoting Reema Consulting Servs., Inc. v. United States, 107 Fed. Cl. at 527).

The differences between the various applications of the "reasonable under the circumstances" test are, in application, subtle, factually specific, and should be undertaken within the context of the general, but not unlimited, discretion afforded procurement officials. Given the enormous variations in the facts presented in challenges to corrective action decisions, and the individualized agency reasons for taking corrective action, the court's review must be based on the entire administrative record before the court. Moreover, it is essential that contracting officers carefully and coherently document corrective action decisions in order to provide the best possible clear explanation for such decisions. Such clear presentation of the reasons for taking corrective action is the best defense to continuing litigation challenging an agency's decision to take corrective action, such as this bid protest.

When the court finds that an agency has acted unreasonably in a procurement, including regarding corrective action, the court may award declaratory and injunctive relief. <u>See</u> 28 U.S.C. § 1491(b)(2). The court may enjoin an agency from implementing corrective action if the corrective action is found to be unreasonable. <u>See</u> <u>SOS Int'l LLC v. United States</u>, 127 Fed. Cl. 576, 585 (2016). In <u>Centech Group, Inc. v. United States</u>, the Federal Circuit set out the test for a permanent injunction, stating:

> To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief.

<u>Centech Grp., Inc. v. United States</u>, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing <u>PGBA, LLC v. United States</u>, 389 F.3d 1219, at 1228–29 (Fed. Cir. 2004) (citing <u>Amoco Prod. Co. v. Vill. of Gambell, Alaska</u>, 480 U.S. 531, 546 n.12 (1987))); <u>see also</u> <u>Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd.</u>, 357 F.3d 1319, 1325 (Fed. Cir.) (finding that a plaintiff who cannot demonstrate actual success on the merits cannot prevail on its motion for permanent injunctive relief), <u>reh'g</u> and <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2004); <u>Remington Arms Co., LLC v. United States</u>, 126 Fed. Cl. 218, 232 (2016); <u>MVS USA, Inc. v. United States</u>, 111 Fed. Cl. 639, 649 (2013); <u>CW Gov't Travel, Inc. v. United States</u>, 110 Fed. Cl. 462, 494 (2013); <u>Contracting, Consulting, Eng'g LLC v. United States</u>, 104 Fed. Cl. at 340 (citing <u>Centech Grp., Inc. v. United States</u>, 554 F.3d at 1037) (citation omitted). Success on the merits has been said to be "the most important factor for a court to consider when deciding whether to issue injunctive relief." <u>Dellew Corp. v. United States</u>, 108 Fed. Cl. 357, 369 (2012) (citing <u>Blue & Gold Fleet, L.P. v. United States</u>, 492 F.3d at 1312). While success on the merits is necessary, it is not sufficient for plaintiff to establish that it is entitled to injunctive relief. <u>See</u> <u>Contracting, Consulting, Eng'g LLC v. United States</u>, 104 Fed. Cl. at 353 ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well.") (citing <u>PGBA, LLC v. United States</u>, 389 F.3d at 1228-29). The four factors are to be considered collectively, rather than individually, such that

> "[n]o one factor, taken individually, is necessarily dispositive. . . .  [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." <u>FMC Corp. [v. United States]</u>, 3 F.3d [424] at 427 [(Fed. Cir. 1993)]. Conversely, "the absence of an adequate showing with regard to any one factor may be sufficient" to deny injunctive relief. <u>Id.</u>

<u>Sheridan Corp. v. United States</u>, 94 Fed. Cl. 663, 668 (2010); <u>see</u> <u>also</u> <u>Wallace Asset Mgmt., LLC v. United States</u>, 125 Fed. Cl. 718, 727 (2016); <u>Amidon, Inc. v. United States</u>, 124 Fed. Cl. 517, 522 (2015). A plaintiff who cannot demonstrate success on the merits cannot prevail upon a motion for injunctive relief. <u>See</u> <u>Nat'l Steer Car, Ltd. v. Canadian Pacific Ry., Ltd.</u>, 357 F.3d at 1325; <u>see</u> <u>also</u> <u>By Light Prof'l IT Servs., Inc. v. United States</u>, 131 Fed. Cl. 358, 367 (2017).

In the above-captioned bid protest, Novak Birch challenges CMS's decision to take corrective action and seeks injunctive and declaratory relief to prevent CMS from terminating the contract award to Novak Birch, cancelling the solicitation, and returning to market research. Protestor alleges that the corrective action is arbitrary and capricious because "[t]here is no rational basis to justify CMS' voluntary decision to take corrective action" as it is based on a "meritless protest." (emphasis removed). According to protestor, none of Rainmakers' arguments during the previous bid protest in <u>Rainmakers Strategic Solutions, LLC v. United States</u>, Case No. 17-110C, "provided any justification for the CMS' decision to take corrective action and disrupt Novak's award." Protestor alleges "[t]he evaluations of both offerors were reasonable and supported extensively by the record." Protestor argues that Novak Birch's submissions were not "technically unacceptable," even though neither included the PAT, because, according to protestor, "there is nothing in the RFQ evaluation factors, nor in FAR Part 8, which would render a quote 'technically unacceptable' such that it would be removed from consideration," for failing to submit the PAT. According to protestor, its proposal demonstrated that it met the Section 508 accessibility standards despite not having submitted a PAT, which should have been sufficient to be considered "technically acceptable." Additionally, protestor asserts that "the submittal of a completed PAT was not a material solicitation requirement that would render Novak's quote non-responsive" because "the inclusion of a completed PAT had no impact on price, quantity, quality, or delivery of the subject of the [RFQ]." (modification in original). Instead, according to protestor, the PAT was to be submitted to aid in CMS's determination of whether the proposal complied with the Section 508 requirements.

Alternatively, protestor asserts that, to the extent "CMS did have a reasonable basis to take some limited corrective action," "CMS' proposed corrective action is arbitrary, capricious, and violates applicable law because the corrective action exceeds the scope of any corrective action that might be required to address the alleged flaws in CMS' evaluation." Protestor asserts that "CMS did not reasonably tailor its corrective action to the 'errors' identified during the evaluation process" in the previous bid protest. Protestor argues that "reevaluating the offerors' proposals, along with exchanges with both offerors, would be sufficient to address any alleged flaw in the procurement," and that "CMS' decision to return to market research is irrational and cannot survive rational scrutiny." Protestor asserts that Novak Birch will suffer "immediate and irreparable harm . . . if Defendant is permitted to proceed with its unlawful corrective action plan," that the balance of hardships weighs in favor of protestor, and that injunctive relief preventing the corrective action is in the public's interest.

In opposition, defendant and defendant-intervenor argue that CMS's decision to take corrective action was reasonable because the contracting officer perceived a defect in the procurement, that "purchasing the GEO services from a vendor on GSA Schedule 541-5 – yielded no eligible contractors," which "was a problem in need of correction." According to defendant, throughout the course of the preceding bid protest litigation at the GAO and in this court, "the contracting officer came to a better appreciation of the problem posed by Novak's decision to omit a completed Section 508 PAT from its proposal." Defendant asserts that, in her justification, the contracting officer ultimately acknowledged "that Novak's failure to submit a PAT with its proposal presented a

significant risk of a finding that Novak was also ineligible for award" by the court, such that "the agency's chosen procurement vehicle presented a substantial chance of producing no vendors eligible for award." Defendant argues that, faced with the possibility that both Rainmakers and Novak Birch could be eliminated from the competition, and noting the limited competition produced by the solicitation, the contracting officer "concluded that the decision to use the GSA schedule did not result in an award made on a basis most advantageous to the Government." Thus, according to defendant, CMS reasonably decided to "abandon the demonstrably ineffective means of obtaining a GEO contractor, reassess the situation, and proceed anew under a different contract vehicle."

In support of the corrective action decision, defendant-intervenor argues that Novak Birch's proposal was non-responsive because it failed to submit a material document, the PAT, thus, CMS was required to reject the proposal. According to defendant-intervenor, the submission of the PAT was a material requirement because the solicitation stated that offerors "shall" include a PAT in their proposals and that, with regard to 508 Compliance, offerors would be evaluated "as Acceptable or Unacceptable in accordance with the terms of HHSAR [HHS Acquisition Regulation] Provision 352.239-73 Electronic Information and Technology Accessibility Notice (December 2015) (Section L.3)." Defendant quotes HHSAR provision 352-239-73(c), as set forth in the solicitation, as follows: "In order to facilitate the Government's determination whether proposed EIT supplies meet applicable Section 508 accessibility standards, Offerors must submit an HHS Section 508 Product Assessment Template [PAT], in accordance with its completion instructions." Defendant-intervenor asserts that a proposal's failure to timely include a material document required by the solicitation renders the proposal non-responsive. Additionally, defendant-intervenor argues that, pursuant to the solicitation and applicable regulations, the requirement to submit the PAT was necessary to make a proposal "technically acceptable."  Defendant-intervenor argues that the solicitation specifically indicated that the submission of the PAT was a "minimum requirement" and that factor five would be evaluated on an "Acceptable/Unacceptable" basis. Defendant-intervenor asserts that Novak Birch's "failure to submit the PAT rendered its quote technically unacceptable" and, as a result, it should have been eliminated from the competition.

Moreover, defendant and defendant-intervenor argue that the scope of the corrective action was reasonable and related to the errors underlying the procurement process. Defendant and defendant-intervenor assert that the corrective action is designed to cure the procurement flaws that pertain to the eligibility of the offerors and the chosen underlying contract vehicle, the GSA Schedule 541-5 contract, each of which, they argue, would provide an independent basis to terminate the contract, cancel the solicitation, and conduct market research before resoliciting offers to fulfill the requirement. Defendant-intervenor asserts that the corrective action is not overly broad because "CMS had evaluated Novak's proposal to be 'technically acceptable' when Solicitation evaluation criteria required it to be found 'unacceptable,'" which rendered CMS's award decision to Novak Birch "unlawful." According to defendant and defendant-intervenor, the contracting officer reasonably elected not to pursue further discussions in an effort to avoid the risk of additional protests in light of the parties' previously raised arguments in <u>Rainmakers Strategic Solutions, LLC v. United States</u>, Case No. 17-110C, and the instant bid protest. In the corrective action memorandum, the contracting officer states that "reopening

discussions with Rainmakers to allow it to cure its schedule issues seems unnecessary and would most likely result in additional bid protest litigation," thus, the contracting officer concluded that "[e]liminating both vendors from the competition (and leaving CMS with no eligible awardees) is most appropriate." Furthermore, defendant and defendant-intervenor assert that CMS's documentation of the corrective action decision is "detailed and rational."

In this bid protest, the court reviews the administrative record to determine if the corrective action decision was reasonable, coherent, and justified. The administrative record includes the contracting officer's April 7, 2017 corrective action memorandum, which explains that the decision to take corrective action was premised on the contracting officer's determination that, as a result of the earlier-filed bid protest in Rainmakers Strategic Solutions, LLC v. United States, there was a risk that both Rainmakers and Novak Birch, the only two offerors, could both be found ineligible for the contract award, which would leave CMS unable to award a contract under the solicitation. The contemporaneous administrative record establishes that, after the receipt of proposals in response to the solicitation, the contracting officer determined that Rainmakers' proposal was unacceptable because Rainmakers' proposed labor categories from its GSA 541-5 Schedule contract did not align with the key personnel requirements in the solicitation. The contracting officer concluded "that Rainmakers' quote is unacceptable; and [the contracting officer] does not foresee a remedy in which Rainmakers can revise their proposal in order to become acceptable." Thus, after the contracting officer's scope analysis, CMS concluded that Novak Birch was the only remaining offeror that could receive the contract award.

Although CMS originally considered Novak Birch eligible for the contract award, the administrative record does not support that conclusion. The solicitation required offerors to submit a PAT in order to demonstrate the offerors' ability to meet the standards of Section 508 as set forth in 48 C.F.R. § 339.203. As explained above, the solicitation included five technical evaluation factors for the agency to consider when evaluating proposals, and factor five was "508 Compliance (Acceptable/Unacceptable)." The solicitation explained that, with regard to "**508 Compliance**," (emphasis in original) offerors would be evaluated "as Acceptable or Unacceptable" and,"[t]o receive a rating of Acceptable the Offeror must complete the PAT and demonstrate the Offeror's ability to meet the Section 508 standards in accordance with 48 C.F.R. 339.203 for the proposed EIT [Electronic and Information Technology]." (emphasis added). The solicitation also stated that a copy of the PAT "must be included with the proposal submission." (emphasis added). Novak Birch, however, has acknowledged during this bid protest that it did not submit a PAT as part of its proposal. CMS, nonetheless, improperly concluded that Novak Birch "met the requirements of the RFQ to obtain an Acceptable rating for this Technical Evaluation Factor." The technical evaluation panel report explains that,

> [t]he 508 section of the contract was reviewed by the compliance officer and finds Novak Birch's 508 compliance to be acceptable. The contractor indicated that they would fill out a PAT as soon as sufficient details were supplied for them to do so. The compliance officer spoke with the Contracting Officer and they agreed this would be acceptable, provided that

Novak Birch complete a PAT when more information is given. Throughout Novak Birch's proposal, references are made to the importance of making materials and webinars Section 508 compliant.

Although protestor argues that "there is nothing in the RFQ evaluation factors, nor in FAR Part 8, which would render a quote 'technically unacceptable' such that it would be removed from consideration, for failing to submit the *self-evaluation worksheet* regarding 508 compliance," as discussed above, the solicitation was explicit and stated "[t]o receive a rating of Acceptable the Offeror must complete the PAT . . . ." (emphasis in original). Moreover, Novak Birch's references in its proposal to 508 Compliance all referred to compliance in the future.

A thorough review of the administrative record reveals that there is no explanation from the agency as to why CMS did not consider Novak Birch's proposal to be unacceptable, or deficient, due to the missing PAT, even though, in contrast, CMS deemed Rainmakers' proposal to be unacceptable based on the contracting officer's determination that Rainmakers' proposed key personnel labor categories did not align with the solicitation requirements. While the administrative record establishes that the agency afforded a degree of selective flexibility to Novak Birch's proposal with regard to the missing PAT, there does not appear to be any explanation in the administrative record to support the agency's decision, other than the conclusion that, in its proposal, Novak Birch referenced the importance of making materials and webinars compliant with Section 508 and Novak Birch agreed to submit a PAT "as soon as sufficient details were supplied for them to do so." It appears that CMS, in effect, waived the PAT requirement for Novak Birch, however, the administrative record does not include any solicitation amendments or other contemporaneous notice to all offerors that a PAT would not be required. Even though Novak Birch failed to include the PAT in its proposal, CMS moved forward and engaged in exchanges with Novak Birch to address other significant concerns with its proposal, including issues regarding its proposed labor rates and labor categories. Moreover, CMS allowed Novak Birch to submit a revised proposal on September 26, 2016, which, in fact, raised the price of Novak Birch's proposal to $40,945,590.00, which was higher than Rainmakers' proposed price. These exchanges appear to have been improper given that there were acceptability issues with both offerors and, for reasons not evident in the administrative record, CMS only conducted exchanges with Novak Birch. Notably, during these exchanges, CMS did not address the missing PAT with Novak Birch and Novak Birch's revised proposal also did not include a PAT. In its original proposal, Novak Birch stated, in pertinent part:

Our team will include 508 compliance expertise throughout the project lifecycle. We will implement 508-compliant solutions for the GEO website. We will work with the CMS Accessibility Standards team to review design specifications and wireframes, consult with developers and validate 508 compliance during the testing phase of each sprint. If required by CMS, the team will produce and update a 508 Product Accessibility Template (PAT) to outline compliance to 508 requirements.

The parties have stipulated that "[t]he Section 508 language in Novak's revised proposal is identical to the Section 508 language in Novak's original proposal."

As the solicitation explained, the procurement at issue in this bid protest was conducted pursuant to FAR Part 8.4 as a task order award limited to qualified entities under a GSA Federal Supply Schedule, specifically GSA Schedule 541-5. Although FAR Part 8.4 procurements are intended to promote efficiency, and requirements invoked in a FAR Part 15 procurement do not apply in a FAR Part 8.4 procurement, 48 C.F.R. § 8.404(a) (2017), the government is required to follow the standard of fundamental fairness. In IBM Corp. v. United States, 119 Fed. Cl. 145, 157 (2014), which similarly involved a FAR Part 8 procurement, the court explained that "this procurement is governed by FAR Part 8, and therefore, it is analyzed under a standard of fundamental fairness." IBM Corp. v. United States, 119 Fed. Cl. at 157. Other Judges of this court also have considered whether the government violated the requirement of fundamental fairness in the FAR Part 8 procurement process. See Unisys Corp. v. United States, 89 Fed. Cl. 126, 139 (2009) (explaining that, under the FAR, "all contractors and prospective contractors shall be treated fairly and impartially"). In addition, this court considered the requirement to treat offerors fairly in reviewing the previously filed bid protest in Rainmakers Strategic Solutions, LLC v. United States.

During the hearing on March 23, 2017 in the earlier bid protest on the same solicitation that is at issue in the current protest, see Rainmakers Strategic Solutions, LLC v. United States, the undersigned questioned CMS's evaluation of the proposals and indicated that there appeared to be a "fundamental unfairness" in how CMS evaluated the offerors. When addressing defendant's counsel, the court explained: "But essentially you've got two incomplete proposals by your definition. We've got one that is incomplete because they don't meet the labor categories. We've got one that's incomplete because they didn't meet a flat-out solicitation requirement to submit a PAT," and "[i]t seems to me that right there you've got a fundamental unfairness."

Based on the court's assessment and a discussion with the parties concerning the issues in the underlying procurement and award decision, the contracting officer has now determined that there is a risk that the court would find both Rainmakers and Novak Birch's proposals unresponsive and ineligible for the contract award and that the court could issue an injunction against the contract award to Novak Birch. The contracting officer explains in the corrective action memorandum that she began to perceive the risk that Novak Birch may be deemed ineligible for award after the hearing on March 23, 2017, at which she was present, because "the court's preliminary view" appeared to be that both Rainmakers and Novak Birch had submitted proposals with "issues that could have been considered equally by CMS and could both be viewed as reasons why either vendor would not be eligible for an award." Thus, the contracting officer was, in fact, confronted with the risk that, as a result of the bid protest in Rainmakers Strategic Solutions LLC v. United States, CMS would be without an eligible offeror to receive the contract award, for which reason the contracting officer decided to take the now-challenged, corrective action.

Protestor argues that the corrective action is arbitrary and capricious because it is not premised on any identified procurement error and relies on the contracting officer's statement included in the corrective action memorandum that she does not agree with the court's assessment that Novak Birch's proposal may have been ineligible for award. In her corrective action memorandum, the contracting officer stated: "I am not convinced that the corrective action taken at GAO was incorrect. Novak Birch was not 'non-responsive.' They did address 508 compliance thoroughly within their technical proposal and addressed the PAT even though one was not submitted." In the same corrective action memorandum, after the contracting officer tried to defend her position that Novak Birch's proposal was "not 'non-responsive,'" she also, apparently reluctantly, acknowledged that the agency did not follow the solicitation evaluation criteria for the Section 508 PAT requirement when it considered Novak Birch's proposal. The contracting officer wrote: "[t]he instructions to quoters used the term 'technically acceptable' and the Technical Evaluation Panel rated Novak Birch as 'Acceptable' even though the evaluation criteria clearly stated that this rating could only be assigned to a vendor that submitted a completed PAT, which Novak Birch did not." The contracting officer determined that this deviation from the solicitation evaluation criteria created the risk that, as a result of the bid protest litigation, Novak Birch's proposal could be considered non-responsive, thus making Novak Birch ineligible for the contract award. Although, protestor argues that "the Contracting Officer fails to state how the *risk* of a potentially adverse decision by this court justifies revocation of the valid contract to Novak," the contracting officer explained in her memorandum that if both Novak Birch and Rainmakers are deemed ineligible for the contract award, CMS would be left with no available option for awarding the contract. (emphasis in original).

The contracting officer attributed the risk that CMS would be without an eligible offeror, in large part, due to the agency's decision to use the GSA Schedule 541-5 contract as the vehicle for this procurement, which narrowed the pool of offerors. In fact, only Rainmakers and Novak Birch responded to the solicitation. The corrective action memorandum explains that, according to the contracting officer, the GSA Schedule 541-5 contract was not "the most advantageous procurement vehicle."

> Based on market research, the General Administration Services (GSA) [sic] Federal Supply Schedule (FSS) was thought to be a viable, streamlined approach to acquiring these necessary services; however, through this protest process, the Centers for Medicare & Medicaid Services (CMS) has come to realize that due to the complex nature of the requirement and the newness of a majority of the services being procured, the narrowness of the GSA schedule was not the most successful method.

In the corrective action memorandum, the contracting officer describes the market research conducted prior to the procurement and asserts that "[b]ased on this market research, GSA appeared to be a feasible efficient approach to acquiring the GEO requirements." Currently, the contracting officer has found that, despite the results of the initial market research, "procuring this requirement through the GSA schedule is not the viable option that was originally anticipated."

Although, in this bid protest, the contracting officer's corrective action memorandum contains some personal ambivalence and defensiveness of her earlier decision to qualify Novak Birch, her corrective action decision to cancel the contract award to Novak Birch and to re-procure is properly based on flaws in the procurement process demonstrated in the administrative record before the court. A review of the administrative record demonstrates that the risks perceived by the contracting officer were reasonable and justified the decision to take the most recent corrective action. As noted, the initial procurement process yielded only two offerors, and there were problems with both Rainmakers' and Novak Birch's proposals from the beginning of the evaluation process that affected their eligibility to receive the contract award, and which, justifiably, finally, has caused the agency to re-evaluate its earlier decision to go forward with the current solicitation, utilizing the GSA Schedule 541-5 vehicle. The agency's decision to take corrective action was based on the contracting officer's informed assessment that the underlying procurement approach was flawed because only two proposals, both of which contained apparent possible errors resulting in dual ineligibility for award, had been received. Given the contracting officer's perception that a serious risk existed that no eligible contractors would be available to receive the contract award under the existing solicitation, CMS's choice to cancel the solicitation and re-procure to meet the requirement was reasonable.

Protestor also argues that "[a]gencies may only take corrective action where there is an **actual prejudicial error** in the evaluation of proposals." (emphasis in original). Although it is well-established that a protestor must show that it was prejudiced by an alleged error in a procurement in order to receive injunctive relief, this court has held that "the rule does not, on the other hand, stand for the proposition that an agency can rationally act in a procurement to institute corrective action only when there is an error coupled with a showing of prejudice to an offeror." Jacobs Tech. Inc. v. United States, 131 Fed. Cl. at 452. Novak Birch appears to be trying to make the same argument that the protestor in Jacobs Technology made by seeking to impose a prejudice requirement on the agency and asserting that corrective action must be based on prejudicial error, see Jacobs Tech. Inc. v. United States, 131 Fed. Cl. at 454, but to no avail. Protestor's argument that an agency only may take corrective action when there is an actual prejudicial error during the evaluation of proposals is too restrictive, as procurement errors can occur in a variety of ways, and not just during the evaluation phase. Moreover, to the extent protestor argues that the corrective action decision is arbitrary and capricious because the contracting officer has not admitted that a procurement error exists, as discussed above, an admission of error is not necessary to justify a corrective action decision. See Wildflower Int'l, Ltd. v. United States, 105 Fed. Cl. at 386; see also ManTech Telecommunications & Info. Sys. Corp. v. United States, 49 Fed. Cl. at 72.

Having found that CMS's decision to take corrective action was reasonable, the court considers whether the scope of the corrective action was reasonable under the circumstances. See Prof'l Serv. Indus., Inc. v. United States, 129 Fed. Cl. at 203. The contracting officer appears to have contemplated two possible courses for the corrective action, "either eliminat[e] both vendors from the competition . . . or allow both vendors equal opportunities to revise their proposals to address the deficiencies" that CMS found in their proposals. The contracting officer considered both these options and decided that

"the best corrective action is to terminate the existing GEO task order to Novak Birch, cancel the GEO Request for Quote (RFQ), reassess the procurement strategy to determine a more appropriate vehicle for obtaining the GEO services, then obtain the GEO services."

Protestor argues that the current corrective action is overly broad and asserts that "the Agency could simply revisit the technical proposals of both offerors and open exchanges between the agency and each offeror." The contracting officer, however, explained in her corrective action memorandum that "[n]othing I have seen to date has changed my view that my determination that Rainmakers is not eligible for award because it did not offer the services CMS was procuring on its GSA schedule contract was incorrect." Because Rainmakers was considered ineligible, the contracting officer concluded that "reopening discussions with Rainmakers to allow it to cure its schedule issues seems unnecessary and would most likely result in additional bid protest litigation." As discussed above, the contracting officer also reasonably perceived there to be a risk that Novak Birch likewise would be found ineligible by the court for contract award because its initial and final proposal lacked the required PAT. Because both offerors had submitted flawed proposals that could be deemed unacceptable under the terms and requirements of the solicitation, the contracting officer concluded that discussions were not an appropriate form of corrective action. The perceived risks pertained to the offerors' eligibility to receive the contract award based on the proposals that were submitted and were not just evaluation errors that could be resolved by revisiting the technical proposals of both offerors. That both Rainmakers and Novak Birch had submitted proposals in response to the solicitation that were potentially non-responsive is pertinent to each offerors' eligibility, not to how CMS evaluated the proposals. As this court has previously held, when the agency receives proposals from ineligible offerors, the agency should resolicit proposals and re-compete the contract. See Guardian Moving & Storage Co., Inc. v. United States, 122 Fed. Cl. 117, 128 (2015), aff'd, 657 F. App'x 1018 (Fed. Cir. 2016) ("[I]f the court found that both Guardian and MVS were ineligible for award, the agency would be obligated to resolicit the contract . . . ." (internal citations omitted).); see also Allied Tech. Grp., Inc. v. United States, 94 Fed. Cl. 16, 37 (2010), aff'd, 649 F.3d 1320 (Fed. Cir. 2011) ("[I]f the Court finds that both Allied and Monster were ineligible for award, DOJ would be obligated to resolicit the contract and Allied could compete for the contract again.").

Moreover, the agency's concerns that the GSA Schedule 541-5 is too restrictive as a procurement vehicle to promote competition for this requirement cannot be addressed through discussions or re-evaluation of the technical proposals. The contracting officer explained in her corrective action memorandum that the decision to use the GSA Schedule 541-5 contract was not the most advantageous or strategic method for CMS, and that CMS intends to conduct additional market research to determine a more appropriate, competitive procurement vehicle. As noted above, after the exchanges with CMS, Novak Birch's revised proposal more than doubled in price from [Redacted] to $40,945,590.00, which further supports the agency's determination that the current procurement method was not the most advantageous to the government, and, likely, would not result in the agency receiving the best value.

In this bid protest, CMS's corrective action was rationally related to the risks inherent in both submitted proposals and the problematic issues identified throughout both of the related bid protest lawsuits, as documented in the administrative record. Protestor has failed to prove that CMS's corrective action was arbitrary, capricious, or otherwise not in accordance with the law. The administrative record justifies CMS's corrective action decision as "reasonable under the circumstances" because it was intended to cure the issues and risks presented by the underlying solicitation and procurement process. The risk that there would be an absence of any offerors eligible to receive the contract award under the existing solicitation justifies the contracting officer's decision to cancel the solicitation and conduct additional market research to determine the most advantageous procurement method for CMS. Because the corrective action decision was reasonable under the circumstances, protestor fails to succeed on the merits of its bid protest, and Novak Birch is not entitled to the injunctive relief that it seeks.

## CONCLUSION

For the reasons stated above, protestor's motion for judgment on the administrative record is **DENIED**. Defendant and defendant-intervenor's cross-motions for judgment on the administrative record are **GRANTED**. Protestor's request for preliminary and permanent injunctive relief is **DENIED.** The Clerk of the Court shall enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**